**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

JEREMY D. EVERIDGE,          :
                                   :
      Plaintiff,             :
                                   :     CASE NOS.: 5:12-CV-497 (LJA)
v.                           :
                                   :
WELLS FARGO BANK, N.A., in its    :
Individual Capacity and as Successor by  :
Merger to WELLS FARGO HOME    :
MORTGAGE, INC., and FEDERAL     :
NATIONAL MORTGAGE            :
ASSOCIATION,                 :
                                 :
      Defendants.         :
                                 :

## ORDER

Before the Court are Defendants Wells Fargo Bank, N.A.'s ("Wells Fargo") and Federal National Mortgage Association's ("Fannie Mae") Motion for Summary Judgment (Doc. 40) and Fannie Mae's Motion for Judgment on the Pleadings (Doc. 39). For the reasons that follow, Defendants' Motions (Docs. 39, 40) are **GRANTED**.

## FACTUAL BACKGROUND[1]

This action arises out of the alleged wrongful foreclosure of Plaintiff's property located at 341 Edge Road, Forsyth, Georgia 31029 (the "Property"), and Wells Fargo's alleged mishandling of certain insurance proceeds (the "Insurance Proceeds") that it received following the destruction of Plaintiff's modular home located on the Property (the

---

[1] The relevant facts are derived from the Complaint (Doc. 1), Defendants' Answer to the Complaint (Doc. 7), Defendants' Statement of Undisputed Facts (Doc. 40-2), Plaintiff's Response to Defendants' Statement of Undisputed Facts (Doc. 46-2), Plaintiff's Statement of Material Facts (Doc. 46-1), and the record in this case. Where relevant, the factual summary also contains undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits, all of which are construed in the light most favorable to Plaintiffs as the nonmoving party. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Home").[2] At the time his Home was destroyed, Plaintiff had been in default under his mortgage for nearly two years, and the Parties were attempting to finalize a loan modification. Although Plaintiff requested that Wells Fargo use the Insurance Proceeds to replace the Home, Wells Fargo would not commit to honoring Plaintiff's request unless he was current under his mortgage or in good standing under a valid modification.

Despite numerous attempts by Wells Fargo to modify his loan, Plaintiff repeatedly failed to timely produce the necessary documentation and financial information to finalize a modification. As a result, Wells Fargo eventually foreclosed on the Property and applied the Insurance Proceeds to the outstanding amount of the loan instead of replacing the Home.

## I.    **The Loan**

On or about May 23, 2003, Plaintiff Jeremy D. Everidge, and his wife, Tiffany L. Everidge, obtained a loan from Wells Fargo for the principal amount of $83,200 (the "Loan"). (Doc. 40-2 at ¶ 3.) In connection with the Loan, Plaintiff and Mrs. Everidge executed a promissory note (the "Note") and a security deed (the "Security Deed"). Pursuant to Section 20 of the Security Deed, Wells Fargo subsequently sold the Note to Fannie Mae, but remained as the servicer of the Loan. (*Id.* at ¶¶ 14-16.)

Under the Note, Plaintiff and Mrs. Everidge were required to make monthly payments of $528.12 for a thirty-year period. (Doc. 40-8 at § 3.) If Plaintiff and Mrs. Everidge defaulted, the Note required them to pay late fees and authorized Wells Fargo to require full and immediate payment of the Loan as well as collect costs and expenses, including attorney's fees. (*Id.* at § 6.) The Security Deed likewise entitled Wells Fargo to require full and immediate payment of the Loan and exercise its right to foreclose on the

---

[2] Local Rule 56 provides that "[a]ll material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." Throughout Plaintiff's Response to Defendants' Statement of Undisputed Facts (Doc. 40-2), Plaintiff purportedly "controverts" Defendants' statements, but either does not specifically dispute, or even address, certain facts stated by Defendants, or point to anything in the record to support his contravention. (*See* Doc. 46-2.) Instead, Plaintiff simply reiterates arguments advanced in his opposition brief. Accordingly, those facts asserted by Defendants but not specifically controverted by Plaintiff with specific citation to the record are deemed admitted. Of course, Defendants still bear the burden to show "that there is no genuine issue as to any material fact," Fed. R. Civ. P. 56(c), and that their motion is supported by the evidence submitted. *See United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101-02 (11th Cir. 2004).

Property in the event Plaintiff and Mrs. Everidge defaulted on the Loan and failed to cure the default after receiving notice from Wells Fargo. (Doc. 1-2 at § 22.) In addition, Section 9 of the Security Deed provided that, if Plaintiff and Mrs. Everidge failed to perform the covenants and agreements under the Security Deed, Wells Fargo was entitled to "do and pay for whatever [was] reasonable or appropriate to protect [Wells Fargo's] interest in the Property and rights under [the Security Deed]," including paying reasonable attorneys' fees. (*Id.* at § 9.) Section 9 further provided that "[a]ny amounts disbursed by [Wells Fargo] under [] Section 9 shall become additional debt of Borrower secured by [the Security Deed]" and bear interest. (*Id.*) Similarly, Section 14 of the Security Deed authorized Wells Fargo to "charge [Plaintiff] fees for services performed in connection with [Plaintiff's] default . . . including, but not limited to, attorney's fees, property inspection and valuation fees." (*Id.* at § 14.) Lastly, Section 22 of the Security Deed – the provision governing default and foreclosure – provided that Wells Fargo was "entitled to collect all expenses incurred in pursuing the remedies provided in Section 22, including, but not limited to, reasonable attorney's fees and costs of title evidence." (*Id.* at § 22.)

In March 2007, Plaintiff and Mrs. Everidge divorced and agreed, as part of a divorce settlement, that Mrs. Everidge would remain in the Home and make all remaining monthly payments under the Loan. (Doc. 40-2 at ¶ 17.) Mrs. Everidge, however, subsequently moved out of the Home and Plaintiff moved in. (Doc. 41-1 at 26:4-10.) Plaintiff thereafter assumed the obligation to make the required monthly payments. (*Id.* at 26:15-17.) Although Plaintiff and Mrs. Everidge made these arrangements amongst themselves, both parties remained liable under the Note and the Security Deed as neither document was amended to reflect any change in ownership or responsibility.

## II.   **Plaintiff's Default and the August Modification**

Beginning in September 2007, Plaintiff and Mrs. Everidge defaulted on the Loan by failing to make their required monthly payments. (Doc. 40-2 at ¶ 19.) Wells Fargo notified Plaintiff of the default in September 2007, but Plaintiff was unable to bring the Loan current. (*Id.* at ¶ 20.) Plaintiff subsequently failed to make his October 2007 and November 2007 monthly payments. (*Id.* at ¶ 21.) As a result, Wells Fargo initiated non-judicial foreclosure

proceedings on the Property in December 2007. (*Id.* at ¶ 22.) To prevent Wells Fargo from foreclosing on the Property, Plaintiff filed for Chapter 13 bankruptcy in the beginning of 2008. (Doc. 41-1 at 28:9-12, 30:17-25.) Plaintiff's bankruptcy petition was subsequently dismissed sometime in the beginning of 2009, and, as a result, Wells Fargo reinitiated foreclosure proceedings in May 2009. (*Id.* at 32:9-11, 33:9-35:10.) Rather than foreclosing on the Property, however, Wells Fargo approved Plaintiff for a HAMP loan modification trial plan (the "Trial Plan") in October 2009. (Doc. 46-1 at ¶ 1.) Plaintiff made three required payments in accordance with the Trial Plan in October, November, and December of 2009. (*Id.* at ¶ 4.) Wells Fargo credited these payments to the missed September 2008 payment. (Doc. 40-2 at ¶ 24.)

As a result of Plaintiff's compliance with the Trial Plan, Wells Fargo offered Plaintiff a permanent HAMP loan modification. (Doc. 46-1 at ¶ 7.) By letter dated June 30, 2010, Wells Fargo informed Plaintiff and Mrs. Everidge that they qualified for an alternative mortgage repayment assistance program (the "June 30 Letter"). (Doc. 40-2 at ¶ 28.) The June 30 Letter instructed Plaintiff and Mrs. Everidge (i) to sign and acknowledge the enclosed loan modification agreement, which identified Wells Fargo as the "Lender" and Plaintiff and Mrs. Everidge, jointly, as the "Borrower" and contained signature lines for both Plaintiff and Mrs. Everidge, and (ii) to complete a hardship affidavit. (*Id.* at ¶ 29.) The Letter further instructed Plaintiff to return the requested documents, along with a payment, if required, within ten business days from the date of the Letter. (*Id.*)

On July 13, 2010, Wells Fargo received a copy of the loan modification agreement, dated July 7, 2010 (the "July Modification"). (*Id.* at ¶ 31.) The agreement, however, did not contain Mrs. Everidge's signature. (*Id.*) As such, Wells Fargo's loss mitigation department rejected the July Modification. (*Id.* at ¶ 32.) On August 2, 2010, Wells Fargo contacted Plaintiff to advise him that in order to proceed with a loan modification, Mrs. Everidge would need to sign the modification agreement or he would need to submit a divorce decree and a quitclaim deed executed by Mrs. Everidge. (*Id.* at ¶ 33.) Plaintiff informed Wells Fargo that he would have Mrs. Everidge execute the agreement. (*Id.* at ¶ 34.) On that same day,

Wells Fargo overnight mailed Plaintiff another copy of a new modification for Mrs. Everidge to sign. (*Id.* at ¶ 35.)

On August 7, 2010, Plaintiff signed the new modification agreement (the "August Modification") and mailed it to Wells Fargo along with his divorce decree. (*Id.* at ¶¶ 36-37.) Mrs. Everidge, however, did not sign the August Modification and Plaintiff did not include the requested quitclaim deed.[3] (Doc. 40-2 at ¶ 36.) As such, Wells Fargo never considered the August Modification valid.[4] (*Id.* at ¶¶ 39, 43, 45.)

Around the middle of September 2010, Wells Fargo contacted Plaintiff by telephone to notify him that Mrs. Everidge's signature was still missing and to reiterate that her signature was required if Plaintiff could not submit a quitclaim deed. (*Id.* at ¶ 46.) Plaintiff, however, failed to timely produce either Mrs. Everidge's signature or a quitclaim deed, and, as a result, Wells Fargo was unable to finalize the August Modification. (*Id.* at ¶ 48.) Consequently, Wells Fargo discontinued exploring workout options at that time, and referred the Loan to outside foreclosure counsel to reinitiate non-judicial foreclosure proceedings against the Property and schedule a foreclosure sale. (*Id.* at ¶¶ 49-50.)

## III.    **The Insurance Proceeds**

On September 14, 2010, Plaintiff informed Wells Fargo that his Home had been completely destroyed in a fire. (*Id.* at ¶ 51.) Plaintiff requested that Wells Fargo use the Insurance Proceeds to replace the Home. As discussed in detail below, although Wells Fargo explored the possibility of replacing the Home, it never finalized an agreement to do so.

---

[3] Plaintiff eventually mailed Wells Fargo a quitclaim deed on February 28, 2011, more than six months after mailing the August Modification. (*See* Doc. 40-27.)

[4] Although a representative of Wells Fargo signed a copy of the partially executed August Modification, there is no evidence indicating that Wells Fargo sent, and Plaintiff received, a copy of the executed agreement. (*Id.* at ¶ 39.) Furthermore, there is no evidence that Plaintiff complied with his obligations under the August Modification, which required him to make sixty monthly payments of $370.16, beginning on September 1, 2011. (*Id.* at ¶ 37.) Although Plaintiff testified at his deposition that he included the first payment when he mailed the August Modification, (Doc. 41-1 at 51:9-52:3), he has not submitted a receipt, bank statement, or any other evidence to substantiate his claim and Wells Fargo has no record of ever receiving any payment. (Doc. 41-2 at 79:10-16.) Plaintiff also testified at his deposition that, following the destruction of his Home, an unknown representative of Wells Fargo instructed him over the phone to cease making any further payment under the August Modification until the Insurance Proceeds were processed and handled. (Doc. 41-1 at 82:6-83:6.) As a result, Plaintiff stated that he made no attempt to make any further payments under the Loan or the August Modification. (*Id.*)

Section 5 of the Security Deed governs the distribution of insurance proceeds and states, in relevant part, that "[u]nless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened." (Doc. 1-2 at § 5.) Section 5 further provides that "[i]f the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by [the Security Deed], whether or not then due, with the excess, if any, paid to Borrower." (*Id.*) Lastly, Section 5 states that if Wells Fargo acquires the Property through foreclosure, Plaintiff assigns to Wells Fargo his right to the insurance proceeds and Wells Fargo "may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or [the Security Deed], whether or not then due." (*Id.*)

By letter dated December 26, 2010, Plaintiff notified Wells Fargo that he wanted the Insurance Proceeds to be disbursed in the following order: (1) to be applied against the past due amount of the Loan; (2) to pay off a second mortgage held by GEMC Federal Credit Union (the "Credit Union"); (3) to replace or repair the Home; and (4) to distribute to the Plaintiff any remaining funds. (Doc. 40-2 at ¶ 52.)

On January 7, 2011, Wells Fargo received an insurance claim check in the amount of $84,500 made payable to Plaintiff, Wells Fargo, and the Credit Union. (Doc. 40-5 at ¶¶ 59-60.)  Because the Credit Union had not endorsed the check, however, Wells Fargo returned it to Plaintiff on January 10, 2011. (*Id.* at ¶ 61.) Wells Fargo eventually received a fully endorsed check in the amount of $84,500 in April 2011, which it deposited into an escrow account until a determination could be made regarding how the funds would be utilized. (Doc. 40-2 at ¶ 64; *see also* Doc. 40-28.) Throughout this process, Plaintiff believed that Wells Fargo would replace the Home with the Insurance Proceeds. (Doc. 40-2 at ¶ 68.)

On January 7, 2011, Wells Fargo sent Plaintiff a three-page letter generally explaining the disposition of insurance funds and the procedures utilized to complete home repairs (the "January 2011 Letter"). (Doc. 1-4.) The January 2011 Letter stated that "[i]n most instances, the [insurance] funds will be disbursed to you in 1/3 increments as they are completed." (*Id.*)

The Letter then outlined the required steps for each distribution, including the required submission of certain documentation. (*Id.*) Specifically, the Letter informed Plaintiff that in order for Wells Fargo to release the first distribution, Plaintiff was required to provide the following: (i) a fully endorsed claim check from the insurance provider; (ii) an insurance adjuster worksheet or a contractor's estimate itemizing damages; (iii) signed contract(s) for repairs from each contractor working on the repairs along with conditional lien wavers; (iv) a Federal Tax Identification form (W-9) for each contractor; (v) Plaintiff's current home and work phone number; and (vi) a general information form. (*Id.*) Significantly, however, the Letter stated that "[i]f your loan is past due, these guidelines may change." (*Id.*)

On February 23, 2011, Plaintiff, through Forsyth Manufactured Homes ("Forsyth"), faxed (i) a copy of Forsyth's W-9, (ii) a copy of an insurance check, (iii) a copy of a general information form, (iv) a copy of a conditional waver of lien executed by Forsyth, and (v) a copy of a purchase agreement from Forsyth estimating the value of a replacement mobile home to be $80,082.25 (the "February 23 Fax"). (Doc. 40-26.)

Also on February 23, 2011, Wells Fargo sent a two-page letter to Forsyth, regarding the placement of a new modular home on the Property (the "Forsyth Letter"). (Doc. 1-5.) The Forsyth Letter requested that Forsyth execute a document included with the Letter and provide Wells Fargo with certain information, including (i) the date of delivery, (ii) the cost of a new mobile home, (iii) the down payment amount received, and (iv) the pending balance to be released. (*Id.*)

On February 28, 2011, Plaintiff, again through Forsyth, faxed Wells Fargo the following: (i) a copy of a quitclaim deed appearing to convey Mrs. Everidge's interest in the Property to Plaintiff; (ii) a copy of a conditional waver of lien executed by Forsyth; and (iii) a copy of a PT-61 filing for the Property (the "February 28 Fax"). (Doc. 40-27.) There is no evidence that Wells Fargo received an executed copy of the document attached to the Forsyth Letter. There is also no evidence that a final agreement was reached between Wells Fargo and Forsyth regarding a replacement for the Home. In fact, the record is devoid of any further communication or correspondence between Wells Fargo and Forsyth.

**IV.**   <u>**Post-Fire Attempts to Modify the Loan**</u>

As detailed below, from January 2011 through July 2011, Wells Fargo made numerous attempts to modify the Loan. Plaintiff, however, repeatedly failed to timely submit the documentation and financial information needed for Wells Fargo to finalize a modification. As a result, the Loan was not modified, Wells Fargo refused to replace the Home with the Insurance Proceeds, and Wells Fargo foreclosed on the Property on July 5, 2011.

In early January 2011, Wells Fargo reinitiated its efforts to review potential workout options for the Loan, and rescheduled the foreclosure sale for March 2011. (Doc. 40-2 at ¶¶ 54-55.) Wells Fargo contacted Plaintiff by telephone to advise him that certain financial documents were needed in order for it to complete its review of a potential modification. (*Id.* at ¶ 55.) Despite attempts to follow up with Plaintiff and despite not receiving the requested documents, Wells Fargo continued to evaluate workout options. (*Id.* at ¶¶ 57-58.) On January 26, 2011, Wells Fargo forwarded Plaintiff a letter advising him of short-sale options, which Plaintiff subsequently rejected. (*Id.* at ¶ 58.)

In February 2011, Wells Fargo again moved the foreclosure sale date from March 2011 to May 2011, and continued to explore workout options for the Loan. (*Id.* at ¶ 59.) In February and March 2011, Plaintiff followed up with Wells Fargo regarding the status of a loan modification and was advised that the Loan was still under review and that the foreclosure sale of the Property was scheduled for May 2011. (*Id.* at ¶¶ 59, 63.)

On April 22, 2011, Plaintiff again called Wells Fargo to check on the status of a loan modification. (*Id.* at ¶ 66.) Wells Fargo advised Plaintiff that the Loan was still under review and that it had no information regarding the release of the Insurance Proceeds. (*Id.*) Wells Fargo also informed Plaintiff that the foreclosure sale had been rescheduled for July 5, 2011. (*Id.*)

On April 25, 2011, Wells Fargo contacted and advised Plaintiff that it would proceed with another review of workout options upon receipt of updated financial information. (*Id.* at ¶ 70.) During the conversation, Plaintiff explained that shortly after moving to the Property, he had filed for bankruptcy and entered into a bankruptcy agreement that required

8

him to make certain monthly payments on the Loan. (*Id.* at ¶ 71.) Plaintiff further explained that he was presently unemployed but would soon begin working for the fire department. (*Id.* at ¶¶ 72-73.) Based on his explanation, Wells Fargo requested that Plaintiff furnish the bankruptcy agreement, any receipts showing that payments were made pursuant to that agreement, and Plaintiff's offer letter from the fire department. (*Id.* at ¶ 74.) Although Plaintiff indicated that he would furnish the requested documents by the end of the week, Plaintiff never did so. (*Id.* at ¶¶ 75-76.)

By May 2011, the Loan was still in default and Plaintiff had yet to provide the updated documentation for Wells Fargo to complete its review of a potential modification. (*Id.* at ¶ 77.) On May 10, 2011, Wells Fargo's foreclosure counsel notified Plaintiff and Mrs. Everidge in writing that the Property would be sold at the foreclosure sale scheduled for July 5, 2011. (*Id.* at ¶ 78.)

Between May 10, 2011 and May 24, 2011, Wells Fargo corresponded with Fannie Mae regarding the foreclosure of the Property and the use of the Insurance Proceeds. (Doc. 40-30.) Fannie Mae instructed Wells Fargo to continue with the foreclosure sale and reduce the foreclosure bid to the value of the Insurance Proceeds. (*Id.*) Wells Fargo continued to confer with Fannie Mae regarding the use of the Insurance Proceeds, reiterating Plaintiff's desire to use the Proceeds to replace the Home. (*Id.*) In response, Fannie Mae stated that Plaintiff could use the Insurance Proceeds to replace the Home, but instructed Wells Fargo to proceed with the foreclosure and to not release the Insurance Proceeds, unless Plaintiff was current under the Note or was in good standing under a modification agreement. (*Id.*) Thereafter, Wells Fargo continued its efforts to modify the Loan.

On May 26, 2011, Wells Fargo again contacted Plaintiff by telephone and requested the following updated financial information in order to proceed with a modification: (i) an updated hardship letter explaining in detail what had prevented Plaintiff from making the mortgage payments for the previous thirty-one months; (ii) the bankruptcy agreement and all receipts showing that the plan payments were made; (iii) a statement of unemployment benefits, if unemployed, or recent paystubs if employed, or a letter from Plaintiff's employer indicating his wage and hours; (iv) any other type of income received (*i.e.*,

contribution letters and proof of income); (v) an updated divorce decree and quit claim deed, signed and dated; and (vi) an updated financial worksheet displaying Plaintiff's assets. (Doc. 40-2 at ¶ 84.) Wells Fargo advised Plaintiff that the requested information was needed by May 31, 2011, and Plaintiff indicated that he would fax the documents by the weekend. (*Id.* at ¶ 85.) However, by June 7, 2011, Plaintiff had yet to submit the requested documentation and financial information. (*Id.* at ¶ 86.) As a result, on June 20, 2011, Wells Fargo denied the modification due to Plaintiff's unresponsiveness. (*Id.* at ¶¶ 87-88.)

On June 23, 2011, Plaintiff faxed Wells Fargo the following documents: (i) a Workout Questionnaire; (ii) a copy of the PT-61 filing for the Property; (iii) an updated copy of the Quit Claim Deed; (iv) a financial Statement, which appeared to have been completed on June 19, 2011; and (v) a copy of two paystubs, dated June 10 and June 17, 2011, respectively. (*Id.* at ¶ 89.) Based on a review of the fax, however, Plaintiff had failed to provide certain documents that were requested during the May 26, 2011 conversation, including (i) the bankruptcy agreement and all receipts showing that the required payments were made under that agreement, (ii) an updated divorce decree, signed and dated, and (iii) an updated financial worksheet displaying Plaintiff's assets. (*Id.* at ¶ 90.)

## V.   **The Foreclosure of the Property**

On June 30, 2011, Wells Fargo attempted, unsuccessfully, to contact Plaintiff to inform him that it had ceased exploring workout options and that the foreclosure sale scheduled for July 5, 2011 would proceed as planned. (*Id.* at ¶¶ 91-92.) At that time, Plaintiff and Mrs. Everidge were thirty-three months behind on the Loan. (*Id.* at ¶ 95.) As such, the total amount needed to pay off the Loan was $100,369.01, which equaled the sum of (i) the unpaid principal balance of $77,299.83, (ii) interest calculated from October 1, 2008 – the date of the first missed payment – to June 1, 2011, at the rate of $13.24 per day, (iii) escrow overdraft, (iv) recoverable corporate advance, (v) unpaid late charges, and (vi) contractual and other fees and charges. (*Id.*  at ¶ 96.)

By letter dated July 1, 2011, Wells Fargo wrote to Plaintiff and Mrs. Everidge regarding Wells Fargo's review of mortgage assistance options, informing Plaintiff and Mrs. Everidge that after reviewing their information, the investor had declined to modify the

Loan because the Property had not been maintained. (*Id.* at ¶ 97.) On July 1, 2011, when Plaintiff contacted Wells Fargo, Wells Fargo reiterated that the foreclosure sale would proceed as planned on July 5, 2011. (*Id.* at ¶ 98.)

Because the Insurance Proceeds were insufficient to cover the full payoff amount of the Loan, Wells Fargo continued to accelerate the Loan.[5] (*Id.* at ¶ 99.) As a result of Plaintiff's failure to bring the Loan current and to timely provide all of the required documentation to be fully considered for a modification, Wells Fargo, in accordance with the direction it received from Fannie Mae, foreclosed on the Property on July 5, 2011, using the Insurance Proceeds as the bid amount. (*Id.* at ¶ 100.) At that time, the Property had an appraised fair market value of $13,500.[6] (*Id.* at ¶ 105.) According to Forsyth, the replacement value of a new home was $80,082.25. (*Id.* at ¶ 106.)

Following the foreclosure sale, Wells Fargo executed a Special Warranty Deed in favor of Fannie Mae, transferring it title to the Property. (*Id.* at ¶ 103.) Fannie Mae subsequently sold the Property to a third-party purchaser in February 2012. (*Id.* at ¶ 108.)

## PROCEDURAL HISTORY

On December 14, 2012, Plaintiff commenced this action against Wells Fargo and Fannie Mae, alleging eighteen causes of action: (1) Fraud and Deceit; (2) Wrongful Foreclosure; (3) Promissory Estoppel; (4) Breach of Contract – Modification Agreement; (5) Breach of Contract – Deed to Secure Debt; (6) Breach of Contract – Agreement between Credit Union and Wells Fargo; (7) Breach of Fiduciary Duties by Wells Fargo; (8) Breach of the Implied Covenant of Good Faith and Fair Dealing; (9) Wrongful Attempted

---

[5] Plaintiff disputes the total payoff amount, claiming that Wells Fargo improperly charged him for homeowners insurance after his Home had been destroyed and improperly applied the payments made pursuant to the Trial Plan to missed payments. However, Wells Fargo only charged $635.00 for homeowners insurance and the amounts received pursuant to the HAMP trial plan were applied to the missed September 2008 payment, thereby reducing the total amount due under the Note. Therefore, even under Plaintiff's calculation, the amount owed to pay off the Loan would not have been materially different, if at all, from what Wells Fargo claimed Plaintiff owed. Under either calculation, Plaintiff's total indebtedness would have exceeded the amount of the Insurance Proceeds. Plaintiff has not presented any evidence to the contrary.

[6] This value was based on a retrospective appraisal conducted on March 14, 2014 by a Georgia Certified General Real Estate Property Appraiser. (Doc. 40-3.) Plaintiff, however, contends that the Property had an appraised fair market value of $18,600. In support of his contention, he cites to a 2003 appraisal of the Property. (*See* Doc. 40-2 at ¶ 105.) Plaintiff cites to nothing in the record to dispute the appraised value of the Property as of 2011.

Foreclosure; (10) Libel of Title to Land; (11) False Light Invasion of Privacy; (12) Conversion; (13) Intentional Infliction of Emotional Distress; (14) Violation of Georgia's Fair Business Practice Act of 1975; (15) Defective Foreclosure Advertisement; (16) Punitive Damages; (17) Expenses of Litigation; and (18) Preliminary and Permanent Injunctive Relief. (*See* Doc. 1.) In his Prayer for Relief, Plaintiff specifically stated that he was seeking judgment against only Wells Fargo on Counts One through Seventeen. (*Id.* at 45-46.) As to Fannie Mae, the Complaint stated that it was "a party to this action only for purposes of the equitable relief sought by the Plaintiff." (Doc. 1 at ¶ 10.)

On April 8, 2014, Plaintiff filed a Motion for Leave to File First Amended and Recast Complaint (the "Amended Complaint"), claiming that new facts had been discovered during the course of discovery to support an amendment expanding Fannie Mae's liability. (Doc. 30.) The Amended Complaint sought relief against Wells Fargo and Fannie Mae, jointly, on all counts. (*See* Doc. 30-8.) On April 11, 2014, the Court held a Telephone Discovery Conference (the "Hearing") to address Plaintiff's Motion to Amend. Specifically, the Court sought clarification regarding whether Plaintiff was simply seeking to bolster his existing allegations by including newly discovered facts, or whether he was seeking to make additional allegations and introduce new theories of liability. (*See* Doc. 42.) Plaintiff stated that the Amended Complaint merely sought to "clean up the complaint" and "make the summary judgment motions less complicated." (*Id.* at 5.) In response, the Court stated that an amendment would not be necessary to achieve Plaintiff's stated goals because such issues could be resolved amongst the Parties and at the pretrial conference. (*Id.* at 6-7.) The Court held that granting Plaintiff leave to amend would be improper, considering that Plaintiff did not move to amend until April 8, 2014, and the deadline to amend was June 4, 2013, the 30(b)(6) deposition was taken on December 19, 2013, and discovery had ended on January 17, 2014 – nearly 90 days before Plaintiff had filed his Motion. (*Id.* at 5-6.) Accordingly, the Court denied Plaintiff's Motion to Amend. (*Id.*; *see also* Doc. 35.)

Following the Hearing, on April 17, 2014, the Parties filed a Joint Stipulation and Notice of Voluntary Dismissal, dismissing Counts Six, Seven, Nine, Ten, Eleven, Fourteen, and Eighteen. (Doc. 33.) On May 15, 2014, Fannie Mae filed a Motion for Judgment on the

Pleadings pursuant to Federal Rule of Civil Procedure 12(c), asserting that Plaintiff had dismissed the only claim asserted against it. (Doc. 39.) On May 16, 2014, Fannie Mae and Wells Fargo moved for summary judgment on Plaintiff's remaining claims. (Doc. 40.) Plaintiff timely responded to Defendants' respective Motions (Docs. 43, 46), and Defendants filed their respective replies (Docs. 47, 50). The Motions are now ripe for review. *See* M.D. Ga. L.R. 7.3.1(a).

## JUDGEMENT ON THE PLEADINGS

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings."[7] "Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001). In determining whether a party is entitled to judgment on the pleadings, the Court must accept as true all material facts alleged in the non-moving party's pleading and view those facts in the light most favorable to the non-moving party. *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014). "If upon reviewing the pleadings it is clear that the plaintiff would not be entitled to relief under any set of facts that could be proved consistent with the allegations, the court should dismiss the complaint." *Cone Fin. Grp., Inc. v. Employers Ins. Co. of Wausau*, 476 F. App'x 834, 836 (11th Cir. 2012) (quoting *Horsley v. Rivera*, 292 F.3d 695, 700 (11th Cir. 2002)).

In order to overcome a motion for judgment on the pleadings, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[8] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for

---

[7] A trial date has not been set in this matter, and Plaintiff cites no authority demonstrating that Fannie Mae's Motion is untimely. Accordingly, Fannie Mae's Motion is deemed timely. *See Butler v. DeKalb Cnty. Sch. Dist.*, No. 14-CV-1768, 2015 WL 4598292, at *2 (N.D. Ga. July 29, 2015) (holding that defendant's motion for judgment on the pleadings was timely where a trial date had not been set).

[8] Although *Twombly* was decided in the context of a Rule 12(b)(6) motion, "[a] motion for judgment on the pleadings is subject to the same standard as is a Rule 12(b)(6) motion to dismiss." *Roma Outdoor Creations, Inc. v. City of Cumming. Ga.*, 558 F. Supp. 2d 1283, 1284 (N.D. Ga. 2008) (quoting *Provident Mut. Life Ins. Co. of Philadelphia v. City of Atlanta*, 864 F. Supp. 1274, 1278 (N.D. Ga. 1994)); *United States v. Bahr*, 275 F.R.D. 339, 340 (M.D. Ala. 2011); *see also Jiles v. United Parcel Serv., Inc.*, 413 F. App'x 173, 174 (11th Cir. 2011) (applying *Twombly* as standard for motion for judgment on the pleadings).

the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 559. It is not sufficient that the pleadings merely leave "open the possibility that a plaintiff might later establish some set of undisclosed facts to support recovery." *Id.* at 561 (internal quotation and alteration omitted). In sum, dismissal is appropriate if "the complaint lacks sufficient factual matter to state a facially plausible claim for relief that allows the court to draw a reasonable inference that the defendant is liable for the alleged misconduct." *Jiles*, 413 F. App'x at 174 (citing *Twombly*, 550 U.S. at 556)).

As noted above, Plaintiff alleged in the Complaint that the only reason Fannie Mae was named as a Defendant was "for purposes of the equitable relief sought." (*See* Doc. 1 at ¶ 10.) The only cause of action asserted in the Complaint that sought equitable relief was Count Eighteen. Therefore, Fannie Mae contends that because Plaintiff dismissed the only claim asserted against it, it is entitled to judgment on the pleadings. Plaintiff, however, contends that the Court should deny Fannie Mae's Motion because Fannie Mae answered the allegations in the Complaint jointly with Wells Fargo and because the Defendants are represented by the same legal counsel.

Although superficially appealing, Plaintiff's contention fails to address the fact that all of the allegations and causes of action in the Complaint – with the possible exception of Count Eighteen – were specifically directed at Wells Fargo. Moreover, Plaintiff explicitly stated that he was seeking relief on Counts One through Seventeen solely against Wells Fargo and that the only reason Fannie Mae was named as a Defendant was "for purposes of the equitable relief sought." (*Id.*) Even Count Eighteen did not specifically allege any facts against Fannie Mae or state how Fannie Mae was liable to Plaintiff. As such, the Complaint, on its face, lacks sufficient factual matter to state a claim upon which relief can be granted against Fannie Mae.

Nevertheless, Plaintiff contends that granting judgment on the pleadings would be inequitable based on the matters discussed, and the Court's ruling, during the Hearing. Plaintiff, however, misconstrues the events that transpired at the Hearing. During the

Hearing, the Court repeatedly attempted to clarify whether Plaintiff was simply seeking to bolster his allegations against Fannie Mae by alleging newly discovered facts, or whether he was attempting to allege additional theories of liability. In response to the Court's inquiry, Plaintiff represented that the Amended Complaint merely sought to "clean up the complaint" and "make the summary judgment motions less complicated." (Doc. 42 at 5.) Plaintiff never stated that he was seeking to amend the Complaint to hold Fannie Mae liable under all Counts – and not merely Count Eighteen as initially pled. As such, the Court stated that the goal of cleaning up the complaint and making summary judgment less complicated could be achieved without an amendment. The Court emphasized, however, that if Plaintiff did seek to introduce additional theories of liability, then an amendment was the only proper avenue, but that an amendment, at that late stage, was untimely. Contrary to Plaintiff's representations to the Court, the Amended Complaint did precisely what the Court held to be untimely.

As pled in the Complaint, the only theory of liability asserted against Fannie Mae was for equitable relief. The Amended Complaint sought to hold Fannie Mae jointly liable with Wells Fargo on all Counts. Because the Court denied Plaintiff's Motion for Leave to Amend, the only theory of liability asserted against Fannie Mae was dismissed when the Parties voluntarily dismissed County Eighteen. Plaintiff's self-serving interpretation of what the Court held during the Hearing does not alter that result or excuse the fact that Plaintiff failed to timely amend his complaint. Accordingly, because the Complaint does not allege sufficient facts to allow the Court to draw a reasonable inference that Plaintiff is entitled to relief from Fannie Mae, Fannie Mae's Motion for Judgment on the Pleadings (Doc. 39) is **GRANTED.**

To the extent Plaintiff moves the Court to reconsider its denial of his Motion to Amend, such request fails as a matter of law.[9] First, Plaintiff's motion is time-barred pursuant to Local Rule 7.6, which provides that motions for reconsideration must "be filed with the Clerk of court within twenty-eight (28) days after entry of the order or judgment"

---

[9] Plaintiff did not actually file a motion for reconsideration, but simply requested, in the alternative in his response to Fannie Mae's Motion, that the Court reconsider its order. (*See* Doc. 43 at 7-8.)

from which reconsideration is sought. Plaintiff did not submit his request for reconsideration until May 29, 2014, forty-eight (48) days after the Court denied his Motion to Amend. (*See* Doc. 43.) Plaintiff offers no explanation or reasoning as to why the Court should consider his untimely request. Nor has Plaintiff demonstrated that his neglect in failing to timely move for reconsideration is excusable. *See* Fed. R. Civ. P. 6(b)(1)(B) (providing that an enlargement of time after the time to file has elapsed may be only granted for good cause where the movant has demonstrated excusable neglect). As such, Plaintiff's request for reconsideration is time-barred.

Second, even if timely filed, Plaintiff has not asserted a sufficient basis for the Court to reconsider its decision. Instead, Plaintiff conclusively asserts that the Court should permit him to amend his complaint "so that any issues as to [Fannie Mae's] involvement in the torts committed against the Plaintiff can be cured through such Amendment." (Doc. 43 at 8.) Read liberally, the Court will construe Plaintiff's request as a motion brought pursuant Federal Rule of Civil Procedure 60(b). *See Thompson v. Hicks*, 213 F. App'x 939, 941 (11th Cir. 2007) (characterizing the plaintiff's motions for reconsideration as being brought under Rule 60(b)); *see also Hall v. Massachusetts Mut. Life Ins. Co.*, No. 07-CV-172, 2008 WL 926710, at *1 (M.D. Ga. Apr. 4, 2008) ("Although not specifically mentioned in the Rules, a motion seeking to have the court 'reconsider' an earlier order is usually governed by Rule 60.").

Federal Rule 60(b) permits a court to relieve a party from a final judgment, order, or proceeding for any of the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which could not have been discovered earlier with due diligence; (3) fraud, misrepresentation, or other misconduct of an adverse party; (4) a void judgment; (5) a judgment that has been satisfied, released, discharged, reversed, or vacated; (6) or any other reason justifying relief from the operation of judgment. Fed. R. Civ. P. 60(b). "In order to prevail under Rule 60(b), [a party] 'must demonstrate a justification so compelling that the district court was required to vacate its order.'" *Thompson*, 213 F. App'x at 941 (quoting *Solaroll Shade & Shutter Corp. v. Bio–Energy Sys., Inc.*, 803 F.2d 1130, 1132 (11th Cir. 1986)).

Plaintiff's sole reason for the Court to reconsider its decision – to cure any issues as to Fannie Mae's involvement in the alleged torts – does not qualify as a sufficient basis justifying reconsideration under any of the first five clauses of Rule 60(b). Nor does it constitute an exceptional circumstance justifying reconsideration under the last clause. *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) ("Relief under [Rule 60(b)(6) is an extraordinary remedy which may be invoked only upon a showing of exceptional circumstances.")(quotation and alteration omitted). As the Court noted during the Hearing, Plaintiff did not move for leave to amend until 90 days after discovery had concluded and nearly a year after the time to amend had expired. Plaintiff offers no explanation for his delay in moving to amend. As such, Plaintiff has failed to demonstrate his entitlement to relief under Rule 60(b).

Finally, even if the Court granted Plaintiff leave to file the Amended Complaint and denied Fannie Mae's Motion for Judgment on the Pleadings, the Complaint would still be subject to dismissal, as Fannie Mae would be entitled to summary judgment for the reasons explained below.

## SUMMARY JUDGMENT

### I.    Standard

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment when the party contends no genuine issue of material fact remains and the party is entitled to judgment as a matter of law. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Grimes v. Miami Dade Cnty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323 (1986); *Barreto v. Davie Marketplace, LLC*, 331 F. App'x 672, 673 (11th Cir. 2009). The movant can meet this burden by presenting evidence showing there is no genuine dispute of material fact, or by demonstrating to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than summarily deny the allegations or show that there is some metaphysical doubt as to the material facts." *Matsuhita*, 475 U.S. at 586 (citations and internal quotations omitted). Instead, the nonmovant must point to evidence in the record that would be admissible at trial. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form")). Such evidence may include affidavits or declarations that are based on personal knowledge of the affiant or declarant. *See* Fed. R. Civ. P. 56(c)(4).

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict in its favor. *See Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## II.   __Analysis__[10]

### A.   **Fraud (Count One)**

"Under Georgia law, a plaintiff alleging fraud must demonstrate: (1) a false representation by the defendant, (2) the defendant's knowledge that the information is false (scienter), (3) intention to induce the plaintiff to act or to refrain from acting, (4) justifiable reliance by the plaintiff, and (5) damage to the plaintiff." *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1288 (11th Cir. 2007) (citing *Avery v. Chrysler Motors Corp.*, 448 S.E.2d 737, 739 (Ga. Ct. App. 1994)). "For a fraud claim to survive summary judgment, there must be some evidence on each element from which a rational jury could find for the party seeking relief." *nVision Global Tech. Solutions, Inc. v. Cardinal Health 5, LLC*, 887 F. Supp. 2d 1240, 1272 (N.D. Ga. 2012) (citing *Wolfe v. Chrysler Corp.*, 734 F.2d 701, 703-04 (11th Cir. 1984)). Therefore, in order for Plaintiff to survive summary judgment, he must establish that Defendants made false representations on which he justifiably relied. *Fin. Sec.*, 448 S.E.2d at 1289.

In the Complaint, Plaintiff alleges that Wells Fargo misrepresented: (i) that the Insurance Proceeds would be used to replace the Home (the "Insurance Representation"); (ii) that an appraisal of the Property was a condition precedent for reinstating the August Modification (the "Appraisal Representation"); and (iii) that the July 5, 2011 foreclosure sale had been withdrawn and canceled (the "Foreclosure Representation"). (Doc. 1 at ¶ 68.) In his response to Defendants' Motion for Summary Judgment, Plaintiff has seemingly abandoned his claims regarding the latter two alleged misrepresentations by failing to respond to Defendants' arguments concerning those representations. *See, e.g., Edmondson v. Bd. of Trustees of Univ. of Ala.*, 258 F. App'x 250, 253 (11th Cir. 2007) ("In opposing a motion

---

[10] There is no dispute that the claims asserted in this diversity action are governed by Georgia law. *See Travelers Prop. Cas. Co. of Am. v. Moore*, 763 F.3d 1265, 1270 (11th Cir. 2014) ("A federal court sitting in a diversity action applies state law using the choice of law rules of the forum state, in this case Georgia."); *see generally Int'l Bus. Machines Corp. v. Kemp*, 536 S.E.2d 303, 306 (2000) ("Under the rule of *lex loci delictis*, tort cases are generally governed by the substantive law of the place where the tort or wrong occurred."); *Farm Credit of Nw. Florida, ACA v. Easom Peanut Co.*, 312 Ga. App. 374, 381, 718 S.E.2d 590, 600 (Ga. Ct. App. 2011) ("[F]or contract actions, [Georgia courts] apply the *lex loci contractus* rule, which provides that when a contract is made and to be performed in one state, its validity, nature, construction, and interpretation are governed by the substantive law of that state.").

for summary judgment, a party may not rely on her pleadings to avoid judgment against her . . . . Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."(citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995))); *Rd. Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994); *Burnett v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004) ("Failure to respond to the opposing party's summary judgment arguments regarding a claim constitutes an abandonment of that claim and warrants the entry of summary judgment for the opposing party."). Instead, Plaintiff supports his fraud claim by reasserting the Insurance Representation and asserting that Wells Fargo misrepresented that it was the entity with the full authority to negotiate, amend, and modify all terms of the mortgage (the "Authority to Modify Representation"). Therefore, the Court will only address those representations Plaintiff now relies upon to support his claim of fraud.[11]

> i.   The Insurance Representation

Wells Fargo contends that it never affirmatively represented to Plaintiff that the Insurance Proceeds would be used to replace the Home. In response, Plaintiff points to the January 2011 Letter, the Forsyth Letter, the February 23 Fax, and the February 28 Fax as evidence of Wells Fargo's alleged misrepresentation. None of these documents, however, contain an affirmative representation that Wells Fargo would use the Insurance Proceeds to replace the Home. The January 2011 Letter merely provided Plaintiff with a general explanation of Wells Fargo's process of handling insurance proceeds and completing repairs "in most instances." (*See* Doc. 1-4.) It does not affirmatively state or represent that the Insurance Proceeds would be used to replace the Home. (*Id.*) In fact, the Letter put Plaintiff on notice that the process may change if the Loan was past due. (*Id.*)

The other three documents upon which Plaintiff relies do not contain communications *from* Wells Fargo *to* Plaintiff and, therefore, cannot serve as a basis for

---

[11] Even if considered, Defendants would still be entitled to summary judgment on the Appraisal Representation and the Foreclosure Representation. Plaintiff has failed to identify any evidence showing that Wells Fargo represented that an appraisal was a prerequisite to reinstating the August Modification. Furthermore, contrary to his allegations in the Complaint, Plaintiff testified that Wells Fargo told him that it would proceed with the foreclosure sale when he called on July 1, 2015.

asserting that Wells Fargo made the Insurance Representation. *See UWork.com, Inc. v. Paragon Technologies, Inc.*, 740 S.E.2d 887, 898 (2013) ("The general rule in Georgia is that actionable fraud must be based upon a misrepresentation made *to* the defrauded party, and relied upon *by* the defrauded party.") (quotations and citations omitted) (alterations in original). The Faxes were sent *by* Plaintiff *to* Wells Fargo, and the Forsyth Letter was sent *by* Wells Fargo *to* Forsyth.[12] Moreover, the Forsyth Letter simply requested that Forsyth provide certain information regarding a replacement home; there is no discussion of the Insurance Proceeds or any method of payment. (*See supra* at 7, *see also* Doc. 1-5.) Accordingly, Plaintiff has failed to adduce evidence that Wells Fargo represented that the Insurance Proceeds would be used to replace the home.

Even if Wells Fargo had represented that the Insurance Proceeds would be used to replace the Home, Plaintiff's claim would still fail as a matter of law. In Georgia, "[i]t is axiomatic that a false representation made by a defendant, to be actionable, must relate to an existing fact or a past event. Fraud cannot consist of mere broken promises, unfilled predictions or erroneous conjecture as to future events." *Next Century Commc'ns Corp. v. Ellis*, 318 F.3d 1023, 1027 (11th Cir. 2003) (quoting *Fuller v. Perry*, 476 S.E.2d 793, 796 (Ga. Ct. App. 1996)); *Equifax, Inc. v. 1600 Peachtree, L.L.C.*, 601 S.E.2d 519, 525-26 (Ga. Ct. App. 2004) ("The general rule is that actionable fraud cannot be predicated upon promises to perform some act in the future. Nor does actionable fraud result from a mere failure to perform promises made.") (quotation omitted). Therefore, "[r]epresentations concerning expectations and hopes are not actionable." *Fuller*, 476 S.E.2d at 796.

Wells Fargo's communications regarding the use of the Insurance Proceeds and the replacement of the Home "related entirely to future events involving a third party [Forsyth] and consisted entirely of opinions, predictions, and conjectures." *Id.* at 796. Indeed, it is

---

[12] The Court recognizes that a misrepresentation made to a third party may be actionable if the misrepresentation induces "the third party 'to act in some manner on which [the defrauded party] relies.'" *UWork.com*, 740 S.E.2d at 898 (quoting *Florida Rock & Tank Lines, Inc. v. Moore*, 365 S.E.2d 836, 837 (1988)). In other words, an action for fraud may be maintained where "A, having as his objective to defraud C, and knowing that C will rely upon B, fraudulently induces B to act in some manner on which C relies, and whereby A's purpose of defrauding C is accomplished." *Florida Rock*, 365 S.E.2d at 837. However, Plaintiff has not introduced any evidence that Wells Fargo fraudulently induced Forsyth to act in some manner on which Plaintiff relied and with the purpose of defrauding Plaintiff.

undisputed that at the time of the communications, no final agreement had been reached between Wells Fargo and Forsyth to replace the Home. Plaintiff knew no final agreement had been reached as evidenced by his subsequent inquiries and requests to Wells Fargo regarding the Insurance Proceeds, and the absence of a formal agreement between Forsyth and Wells Fargo. As such, any representation concerning the use of the Insurance Proceeds amounted to nothing more than a "mere prospect, expectation or erroneous conjecture," *Griffin v. State Bank of Cochran*, 718 S.E.2d 35, 39 (Ga. Ct. App. 2011) (finding that representation that bank was going to be sold was not actionable where plaintiff knew no sale had been finalized at the time of the representation), and, therefore, "cannot form the basis of a claim for fraud." *Fuller*, 476 S.E.2d at 796; *see also Southeastern Stud & Components, Inc. v. Am. Eagle Design Build Studios, LLC*, No. 07-CV-077, 2008 WL 2967230, at *7 (M.D. Ga. July 30, 2008) (finding that representations by defendant that it would pay plaintiff according to the terms of the contract amounted to "nothing more than unenforceable promises to perform a future act"). This is particularly true where, as here, "no agreement was later reached and no contract was ever entered into by [Wells Fargo] and [Forsyth]." *Infrasource, Inc. v. Hahn Yalena Corp.*, 613 S.E.2d 144, 148 (Ga. Ct. App. 2005).

While "[i]t is true that claims of fraud arising from a representation of a future event made with knowledge that it is false or intention not to perform may be actionable" *Fuller*, 476 S.E.2d at 796, the record is devoid of any evidence indicating that Wells Fargo made the Insurance Representation with knowledge that the Insurance Proceeds would not be used to replace the Home, or that Wells Fargo had the intention not to use the Insurance Proceeds to replace the Home, at the time of the communications. As such, the Insurance Representation is not actionable. *See Griffin*, 718 S.E.2d at 39.

      ii.    <u>The Authority to Modify Representation</u>

Plaintiff contends that Wells Fargo misrepresented that it "was 'the entity that has the full authority to negotiate, amend, and modify all terms of the mortgage,' when, in fact, it was [Fannie Mae] that had final decision-making power as it pertained to [the Loan]." (Doc. 46 at 15.) Plaintiff makes this allegation in support of his fraud claim for the first time in his

Amended Complaint. Because the Court denied Plaintiff's Motion to Amend, however, this representation is not properly before the Court.

Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "The particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (internal quotations and citations omitted).

> Rule 9(b) is satisfied if the complaint sets forth '(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.'

*Id.* (quoting *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997)).

"A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Rather, "[a]t the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)." *Id.* In his Complaint, Plaintiff did not allege the Authority to Modify Representation to support his claim of fraud. Plaintiff may not now circumvent the Court's holding denying him leave to amend by simply recasting the Authority to Modify Representation as a basis to defeat summary judgment. To conclude otherwise would not only render Rule 15(a) superfluous, it would also contravene the purpose underlying Rule 9(b).[13]

Accordingly, because there is no genuine issue of material fact regarding Plaintiff's allegations of fraud, Defendants' Motion for Summary Judgment is **GRANTED** as to Count One.

---

[13] Even assuming, *arguendo*, that the Authority to Modify Representation was properly before the Court, Defendants would still be entitled to summary judgment because Wells Fargo did in fact have the authority to negotiate, amend, and modify the terms of the mortgage. (*See infra* § II(E).)

## B.   Breach of Contract (Counts Four and Five)

Plaintiff claims that Defendants breached the August Modification and the Security Deed. In Georgia, the elements of a breach of contract claim are "(1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *Norton v. Budget Rent A Car Sys., Inc.*, 705 S.E.2d 305, 306 (Ga. Ct. App. 2010) (citations omitted). "A breach occurs if a contracting party repudiates or renounces liability under the contract; fails to perform the engagement as specified in the contract; or does some act that renders performance impossible." *UWork.com*, 740 S.E.2d 887, 893 (quotations citation omitted). In order to prevail, "the breach must be more than *de minimus* and substantial compliance with the terms of the contract is all that the law requires." *Kuritzky v. Emory Univ.*, 669 S.E.2d 179, 181 (Ga. Ct. App. 2008) (citation omitted).

### i.   The August Modification (Count Four)

Plaintiff contends that Defendants breached the August Modification by reinitiating foreclosure proceedings in September 2010, after the agreement allegedly became effective. Defendants, on the other hand, contend that the August Modification never became effective, and, even if it did, it was Plaintiff who breached the agreement by failing to make the required monthly payments. The threshold issue, therefore, is whether the August Modification is a valid contract.

Georgia law requires four essential elements to constitute a valid contract: (1) parties able to contract, (2) consideration, (3) mutual assent to the terms of the contract (*i.e.*, a meeting of the minds), and (4) subject matter upon which the contract can operate. *See* O.C.G.A. § 13-3-1. Defendants contend that the August Modification was never a valid contract because Mrs. Everidge never signed the agreement and Plaintiff did not timely submit the requested quitclaim deed. Thus, according to Defendants, there was never a meeting of the minds.  The Court agrees.

Under Georgia law, the mutual consent of the parties is essential to the formation of a contract. *See* O.C.G.A. § 13-3-2 ("The consent of the parties being essential to a contract, until each has assented to all the terms, there is no binding contract; until assented to, each party may withdraw his bid or proposition."). Thus, where parties have "intended to enter

into an agreement" and "expressed their mutual intentions to be bound," a valid contract has been formed. *Jackson Elec. Membership Corp. v. Ga. Power Co.*, 364 S.E.2d 556, 557-58 (1988). However, "[a]cceptance of an offer must be unconditional, unequivocal, and without variance of any sort; otherwise, there can be no meeting of the minds and mutual assent necessary to contract formation." *Durham v. McLaughlin*, 648 S.E.2d 495, 496 (Ga. Ct. App. 2007) (citation omitted).

> In determining whether there was a mutual assent, courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent, or that meaning which the other contracting party knew the first party ascribed to his manifestations of assent. Further, in cases such as this one, the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement. Where such extrinsic evidence exists and is disputed, the question of whether a party has assented to the contract is generally a matter for the jury.

*Turner Broad. Sys., Inc. v. McDavid*, 693 S.E.2d 873, 878 (Ga. Ct. App. 2010) (citations omitted).

From June 2010 through September 2010, it is undisputed that Wells Fargo repeatedly advised Plaintiff that in order for a loan modification to be effective, both Plaintiff and Mrs. Everidge would need to sign and acknowledge the agreement or Plaintiff would need to submit a copy of his divorce decree and a quitclaim deed. The June 30 Letter clearly stated that both Plaintiff and Mrs. Everidge were required to sign the July Modification in order for it to be effective. Furthermore, upon receiving the partially executed July Modification, Wells Fargo instructed Plaintiff that if Mrs. Everidge was unable to execute the agreement, he would need to submit a copy of his divorce decree and a quitclaim deed. Nevertheless, when Plaintiff submitted the August Modification, he only included a copy of his divorce decree. As a result, Wells Fargo contacted Plaintiff in September 2010 to reiterate that Mrs. Everidge's signature was required if Plaintiff could not submit a quitclaim deed. While Plaintiff contends that he submitted a divorce decree and a quitclaim deed before the foreclosure sale, it is undisputed that he did not submit the quitclaim deed until February 28, 2011, over six months after he returned the August

Modification. Therefore, because Plaintiff failed to timely submit either Mrs. Everidge's signature or a copy of his divorce decree *and* a quitclaim deed, Wells Fargo was free to withdraw its offer to enter into the August Modification and reinitiate foreclosure proceedings. *See* O.C.G.A. § 13-3-2; *GE Commercial Distribution Fin. Corp. v. Ball*, 481 F. App'x 555, 557 (11th Cir. 2012); *Kolbus v. Fromm*, 327 Ga. App. 431, 433, 759 S.E.2d 283, 284 (Ga. Ct. App. 2014) (stating that "an offer to contract may be withdrawn or modified by the offeror before its acceptance by the offeree") (citations, quotations and alterations omitted).

Contrary to Plaintiff's assertions, the record is devoid of any evidence that Wells Fargo manifested to Plaintiff an intention to be bound by the August Modification. That a representative of Wells Fargo signed a file-copy of the partially executed August Modification does not alter that conclusion, as there is no evidence that Plaintiff ever knew, or received a copy, of the executed agreement. In addition, by the time Plaintiff eventually submitted a quitclaim deed, Wells Fargo had already withdrawn its offer to enter into the August Modification.[14] Consequently, the August Modification never became effective. *See Ball*, 481 F. App'x at 557 (finding that there was no enforceable agreement where offeror had withdrawn offer before offeree tried to accept it). As such, Wells Fargo did not breach any agreement by reinitiating foreclosure proceedings in September 2010.

Moreover, even if Wells Fargo manifested an intention to be bound by the August Modification, Plaintiff has failed to introduce sufficient evidence that he complied with his obligations under the agreement. The August Modification required Plaintiff to make sixty monthly payments of $370.16, beginning on September 1, 2010. Plaintiff contends that he made four payments pursuant to the August Modification, and then stopped making payments after an unknown representative of Wells Fargo instructed him to do so pending the resolution of the Insurance Proceeds. First, contrary to Plaintiff's assertions, three of the four payments Plaintiff allegedly made were not pursuant to the August Modification, but rather were made under the Trial Plan in order to determine whether Plaintiff even qualified

---

[14] Wells Fargo's rescission of its offer is evidenced not only by the fact that it had reinitiated foreclosure proceedings in September 2010, but also by the numerous conversations between Wells Fargo and Plaintiff from January 2011 through July 2011, regarding potential workout options. Had the August Modification been effective, those conversations would have been nugatory.

for a modification. Second, Plaintiff has not offered a shred of evidence, other than his own self-serving testimony, to substantiate his claim that he even made the first payment under the August Modification.

While the court must consider the evidence in the light most favorable to Plaintiff as the non-moving party, to defeat Defendants' Motion for Summary Judgment, Plaintiff "must adduce specific evidence from which a jury could reasonably find in his favor; 'the mere existence of a scintilla of evidence in support of his position will be insufficient.'" *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013) (quoting *Anderson*, 477 U.S. at 252). In determining whether this evidentiary threshold has been met, the Court "must view the evidence presented through the prism of the substantive evidentiary burden" applicable to the particular cause of action before it. *Anderson*, 477 U.S. at 254. "Bare and self-serving allegations are inadequate to carry the plaintiff's burden on summary judgment." *Shuler v. Bd. of Trustees of Univ. of Alabama*, 480 F. App'x 540, 544 (11th Cir. 2012) (citing *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 851 (11th Cir. 2000)); *see also Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (finding that "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion").

The Court does not mean to suggest that there are no circumstances under which a plaintiff's testimony will alone carry his burden. However, under the circumstances presented here, including Plaintiff's payment history and repeated failures to timely submit the necessary documentation for a modification, the Court finds that Plaintiff's self-serving testimony is not enough to carry his burden of establishing a genuine issue of material fact. Plaintiff has not submitted a receipt for the money order, a bank statement, or any other evidence to support his claim that he made the first payment; and, Wells Fargo has no record of ever receiving or depositing Plaintiff's payment. There is not a scintilla of evidence in the record to substantiate Plaintiff's self-serving testimony. Therefore, Plaintiff has failed to adduce sufficient evidence from which a reasonable jury could conclude that he made the first payment under the August Modification.

Furthermore, even if Plaintiff did make the first payment, it is undisputed that he did not make any further payments under the August Modification. Although Plaintiff contends

that an unknown representative of Wells Fargo instructed him to cease making payments until the settlement of the Insurance Proceeds, Plaintiff, once again, has offered no evidence to substantiate his claim. In fact, Plaintiff cannot even recall the name or any other identifying information of the Wells Fargo representative. While Plaintiff cites to the Wells Fargo 30(b)(6) deposition to support his claim, (Doc. 46-1 at ¶ 14), that testimony only confirms that the reason the August Modification was never finalized is because Plaintiff failed to submit Mrs. Everidge's signature or the quitclaim deed. (*See* Doc. 41-2 at 83:22-84:18.) Moreover, Plaintiff's statement of what an unknown Wells Fargo representative told him constitutes inadmissible hearsay that cannot be reduced to admissible form, and thus cannot properly be considered on a motion for summary judgment. *See Muhammad v. Sapp*, 494 F. App'x 953, 957 (11th Cir. 2012) (noting that "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999))).[15]

Accordingly, because Plaintiff does not dispute the existence of the extrinsic evidence demonstrating that Wells Fargo did not manifest an intention to be bound by the August Modification and because Plaintiff himself breached the August Modification, there is no genuine issue of material fact regarding Plaintiff's claim of breach of the August Modification. As such, Defendants' Motion as to Count Four is **GRANTED**.

---

[15] Although not addressed by the Parties, Plaintiff essentially argues that the statement of Wells Fargo's representative constituted an oral modification of the August Modification. Georgia law is clear that "unless an oral modification falls within an exception to the Statute of Frauds, such modification is ineffective." *Walden v. Smith*, 546 S.E.2d 808, 810 (Ga. Ct. App. 2001); *see also Thompson v. Lovett*, 760 S.E.2d 246, 249 (Ga. Ct. App. 2014) (noting that "parole agreements to modify a contract required to be in writing by the Statute of Frauds are ineffective"); *see generally* O.C.G.A. § 13-5-30(4) (stating that "[a]ny contract for sale of lands, or any interest in, or concerning lands" must be in writing). Plaintiff has not offered any evidence or argument that an exception to the Statute of Frauds exists here. Therefore, assuming the August Modification was even binding, Plaintiff was still required to continue making payments, regardless of what the Wells Fargo representative allegedly told him over the phone.

ii.   The Security Deed (Count Five)

Plaintiff asserts that Defendants breached the Security Deed by refusing to use the Insurance Proceeds to replace the Home.[16] Section 5 of the Security Deed governs the distribution of insurance proceeds and states, in relevant part, that "[u]nless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened." (Doc. 1-2 at § 5.) However, "[i]f the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by [the Security Deed], whether or not then due, with the excess, if any, paid to Borrower." (*Id.*)

The Parties dispute the meaning of "economically feasible." Plaintiff contends that replacing the Home was economically feasible because the Insurance Proceeds were $84,500.00 and the cost of the new home was $80,082.25. Thus, according to Plaintiff, Defendants' security interest would not have been lessened by replacing the Home because the replacement home was brand new and, therefore, worth more than the Home destroyed in the fire. In response, Defendants contend that replacing the Home would not have been economically feasible because the Loan had been in default for nearly two years at the time the Home was destroyed and there was no reason to believe that Plaintiff had the capacity to bring the Loan current.

In Georgia, "[t]he construction of a contract is a question of law for the court." O.C.G.A. § 13-2-1; *see also Brookside Cntys., LLC v. Lake Dow North Corp*, 603 S.E.2d 31, 32 (Ga. Ct. App. 2004) ("Contract disputes are particularly well suited for adjudication by summary judgment because construction of contracts is ordinarily a matter of law for the court.") (citation omitted). "The hallmark of contract construction is to ascertain the

---

[16] In his response, Plaintiff also contends that Defendants breached the Security Deed by unreasonably and improperly charging Plaintiff for homeowners insurance, interest on the unpaid principle balance of the Loan, and attorney and foreclosure fees. However, the only allegation Plaintiff made in the Complaint was that Wells Fargo breached the Security Deed by refusing the use the Insurance Proceeds to replace the Home. Accordingly, this claim is not properly before the Court. *See Gilmour*, 382 F.3d 1315. Even if it were, Plaintiff's claim would fail as the charges and fees were expressly authorized under the Security Deed and the Note. (Docs. 1-2 at §§ 5, 9, 12, 14, 22; 40-8 at § 6.)

intention of the parties." *Infinity Gen. Ins. Co. v. Litton*, 707 S.E.2d 885, 888 (Ga. Ct. App. 2011); O.C.G.A. § 13-2-3. "When attempting to ascertain the intent of parties to a contract, the court should consider the language of the contract in light of the surrounding circumstances." *Maiz v. Virani*, 253 F.3d 641, 659 (11th Cir. 2001) (citation omitted). "Further, the construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part." *Freund v. Warren*, 740 S.E.2d 727, 730 (Ga. Ct. App. 2013).

The Court agrees with Defendants' construction of Section 5 of the Security Deed. Where, as here, a borrower is in default at the time the property is destroyed, or later falls into default while the property is being repaired, it is not economically feasible for the bank to complete the repair in lieu of applying the insurance proceeds to the outstanding balance of the loan. This interpretation is consistent with the latter portion of Section 5, which provides that if Plaintiff defaults on the Loan and Wells Fargo acquires the Property through foreclosure, then Wells Fargo "may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or [the Security Deed], whether or not then due." (Doc. 1-2 at § 5.)

Contrary to Plaintiff's contention, requiring Wells Fargo to replace the Home would have lessened Defendants' security in the Property. As the Ninth Circuit has reasoned, Wells Fargo's "security would be impaired if it were required to defer foreclosure indefinitely while [Plaintiff] rebuilds his residence. Since [Wells Fargo] is entitled to foreclose at any time, construing the insurance clause so as to allow [Plaintiff] to rebuild would defeat the property rights contemplated by the parties when the trust deed was executed." *Ford v. Manufacturers Hanover Mortg. Corp.*, 831 F.2d 1520, 1524 (9th Cir. 1987). Stated differently, "[i]f [Wells Fargo] had permitted the insurance proceeds to be used for reconstruction, it would have had to part with the security of the cash payment already on hand, and would have had to defer indefinitely, until construction was completed, its right to foreclose on the security of the real property, both of which changes in its position would have constituted an impairment of its security as a matter of law." *Id.* at 1522. As such, upon Plaintiff's default, Wells Fargo was under no obligation to use the Insurance Proceeds to replace the Home. *See*

*Pressler v. Am. Home Mortg. Servicing Inc.*, No. 11-CV-6400, 2013 WL 1320462, at *4 (N.D. Cal. Apr. 1, 2013) (construing the identical provision as at issue here and holding that "[o]nce the [Borrower] defaulted, Lender was under no obligation to release [insurance] funds").

This conclusion is also consistent with Georgia law regarding a secured party's entitlement to insurance proceeds where the secured party is designated as a loss payee and the secured property suffers a loss. *See Pearlman v. Sec. Bank & Trust Co. of Albany*, 582 S.E.2d 219, 220 (Ga. Ct. App. 2003) ("Where a secured party is designated as loss payee under an insurance policy, the secured party is generally entitled to the insurance proceeds up to the amount of the debt that is secured by the property which suffered the loss, and the remainder belongs to the property owners."). Under such circumstances, "[w]here the evidence demonstrates that the amount of debt is in excess of the insurance proceeds, a debtor has no interest in the policy proceeds." *CIT Grp./Equip. Fin., Inc. v. Northbrook Prop. & Cas. Ins. Co.*, 515 S.E.2d 845, 847 (Ga. Ct. App. 1999). Therefore, because Plaintiff's total indebtedness under the Loan exceeded the amount of the Insurance Proceeds, Plaintiff had no interest in the Proceeds.

Even assuming, *arguendo*, that Section 5 required Defendants to use the Insurance Proceeds to replace the Home, Plaintiff's claim would still fail. Georgia law provides that "[i]f the nonperformance of a party to a contract is caused by the conduct of the opposite party, such conduct shall excuse the other party from performance." O.C.G.A. § 13-4-23. "Under this standard, the non-breaching party's performance must have been rendered 'useless or impossible' in order to be excused." *Rourk v. Bank of Am. Nat. Ass'n*, 587 F. App'x 597, 598-99 (11th Cir. 2014) (collecting cases). Thus, "in order to constitute a defense to this action, [Defendants'] nonperformance must have been caused by conduct of [Plaintiff] which made [Defendants'] performance useless or impossible." *Progressive Elec. Servs., Inc. v. Task Force Const., Inc.*, 760 S.E.2d 621, 626 (Ga. Ct. App. 2014) (citation omitted).

As discussed, Plaintiff was extremely delinquent at the time the Home was destroyed and when the Insurance Proceeds were received. Fannie Mae advised Wells Fargo that the Insurance Proceeds could be used to replace the Home, but only if Plaintiff was current under the Loan or in good standing under a modification agreement. Otherwise, Fannie Mae

instructed Wells Fargo to proceed with the foreclosure. It is undisputed Plaintiff was not current under the Loan and made no attempts to become current. Furthermore, Plaintiff repeatedly failed to timely submit the necessary documents and financial information for a modification. And, even if the August Modification was effective, Plaintiff was not in good standing under it because he had ceased making payments in September 2010 – assuming he even made the first payment. As such, it was Plaintiff's nonperformance that ultimately caused Defendants to apply the Insurance Proceeds to the balance of the Loan instead of replacing the Home.

Moreover, nothing in the record indicates that replacing the Home would have allowed Plaintiff to reinstate the Loan and avoid foreclosure, especially considering Plaintiff's payment history and repeated failures to timely submit the necessary documents for a modification. Therefore, using the Insurance Proceeds to replace the Home would have rendered Defendant's performance useless as the ultimate outcome – the foreclosure of the Property – would have still occurred and Plaintiff would have still held no equity in the Property. As such, because it was Plaintiff's conduct that caused Defendants to not use the Insurance Proceeds to replace the Home and because replacing the Home would have not affected the ultimate foreclosure of the Property, Defendants were relieved of any obligation to use the Insurance Proceeds to Replace the Home.

Accordingly, because there is no genuine issue of material fact regarding breach of Section 5 of the Security Deed, Defendants' Motion for Summary Judgment is **GRANTED** as to Count Five.

### C.   Promissory Estoppel (Count Three)

In Georgia, promissory estoppel "requires a showing that (1) the defendant made certain promises, (2) the defendant should have expected that the plaintiffs would rely on such promises, and (3) the plaintiffs did in fact rely on such promises to their detriment." *Adkins v. Cagle Foods JV, LLC*, 411 F.3d 1320, 1326 (11th Cir. 2005) (citation omitted). "Importantly, where a plaintiff seeks to enforce an underlying contract which is reduced to writing, promissory estoppel is not available as a remedy." *Id.* (citing *Bank of Dade v. Reeves*, 354 S.E.2d 131 (1987)). "Furthermore, promissory estoppel does not apply to

representations concerning the future, but to representations of past or present facts." *Id.* (citing *Voyles v. Sasser*, 472 S.E.2d 80 (Ga. Ct. App. 1996)).

Plaintiff reasserts the Insurance Representation to support his claim of promissory estoppel, relying on the same four documents to support his contention that Wells Fargo promised to use the Insurance Proceeds to replace the Home. First, as explained in Section II(A)(i), *supra*, none of these documents contain such a representation. Second, to the extent Plaintiff is simply seeking to enforce Section 5 of the Security Deed, such claim is barred by the existence of a valid contract. *Adkins*, 411 F.3d at 1326. Third, any subsequent promise made by Wells Fargo concerning the Insurance Proceeds related to a future event, and was thus unenforceable. *Id.* As such, Plaintiff has failed to establish that Wells Fargo made an enforceable promise upon which he could justifiably rely.

Plaintiff has also failed to establish that Wells Fargo should have expected him to rely on any promise concerning the use of the Insurance Proceeds. The January 2011 Letter merely provided Plaintiff with a general explanation of Wells Fargo's process of handling insurance proceeds and completing repairs "in most instances." (Doc. 1-4.) It also contained an "important note," stating that the general guidelines could change if the Loan was in default. (*Id.*) The three other documents upon which Plaintiff relies were not sent from Wells Fargo to Plaintiff.[17]

Accordingly, Plaintiff's claim for promissory estoppel fails as a matter of law. As such, Defendant's Motion for Summary Judgment is **GRANTED** as to Count Three.

### D.   Wrongful Foreclosure (Count Two)

"In Georgia, 'a plaintiff asserting a claim of wrongful foreclosure [must] establish a legal duty owed to it by the foreclosing party, a breach of that duty, a causal connection between the breach of that duty and the injury it sustained, and damages.'" *Abdullahi v. Bank*

---

[17] It is also questionable whether Plaintiff could have reasonably relied on any representation concerning the Insurance Proceeds given his delinquency status under the Loan and the absence of a valid modification agreement. *See Abdullahi v. Bank of Am., NA*, 549 F. App'x 864, 867 (11th Cir. 2013) ("Promissory estoppel cannot be applied unless the promisee reasonably relied on the promise." (quoting *Gerdes v. Russell Rowe Commc'ns*, 502 S.E.2d 352, 354 (1998))).

*of Am., NA*, 549 F. App'x 864, 866 (11th Cir. 2013) (quoting *Heritage Creek Dev. Corp. v. Colonial Bank,* 601 S.E.2d 842, 844 (2004)).

Plaintiff contends the he is entitled to relief because Defendants breached the Security Deed and the August Modification. Plaintiff further contends that a jury question exists regarding whether Defendants fairly exercised the power of sale clause "because Defendants instructed Plaintiff not to make payments while the loan modification and insurance proceeds were being worked out." (Doc. 46 at 11.) As discussed above, however, Plaintiff's breach of contract claims fail as a matter of law. Furthermore, there is no evidence to substantiate Plaintiff's claim regarding what an unknown Wells Fargo representative told him. Thus, Plaintiff has failed to establish that Defendants breached a duty owed to him.

Moreover, under Georgia law, "[f]ailure to make the proper loan payments or tender the amount due defeats any wrongful foreclosure or attempted wrongful foreclosure claims." *White v. Bank of Am., N.A.*, No. 12-CV-3834, 2013 WL 1963786, at *3 (N.D. Ga. May 10, 2013); *Harvey v. Deutsche Bank Nat. Trust Co.*, No. 12-CV-1612, 2012 WL 3516477, at *2 (N.D. Ga. Aug. 14, 2012) ("When the borrower cannot show that the alleged injury is attributable to the lender's acts or omissions, the borrower has no claim for wrongful foreclosure. Failure to make the proper loan payments defeats any wrongful foreclosure claim.").

The record is clear that Wells Fargo foreclosed on the Property after Plaintiff had been in default for over two years and the Parties were unable to finalize a modification. Despite Plaintiff's assertions to the contrary, the August Modification was never a valid agreement, and, even if it was, it is undisputed that Plaintiff failed to make the required monthly payments under that agreement. Pursuant to Section 6 of the Note and Section 22 of the Security Deed, Wells Fargo was entitled to accelerate the balance of the Loan and exercise the power of sale upon Plaintiff's default. Therefore, because Plaintiff was in default at the time Wells Fargo initiated foreclosure proceedings and ultimately foreclosed on the Property, the foreclosure was proper. Plaintiff has not presented any evidence to the contrary. As such, Plaintiff's alleged injuries are solely attributable to his own acts and omissions. *See Heritage Creek Dev. Corp. v. Colonial Bank*, 601 S.E.2d 842, 845 (Ga. Ct. App.

2004) (finding that plaintiff's injury was "solely attributable to its own acts or omissions both before and after the foreclosure" because borrower defaulted on the loan payments, failed to cure the default, and did not bid on the property at the foreclosure sale). Accordingly, Plaintiff cannot establish the requisite casual connection for a claim of wrongful foreclosure.

Furthermore, even if Plaintiff had been able to establish that Defendants breached a duty owed to him and that the breach caused him injury, Plaintiff has not adduced sufficient evidence to establish that he was damaged. The measure of damages in a wrongful foreclosure action is the difference between the fair market value of the property at the time of sale and the indebtedness owed thereon at that time. *See Aetna Fin. Co. v. Culpepper*, 320 S.E.2d 228, 232 (1984) ("The measure of damages where a wrongful foreclosure has occurred is the full difference between the fair market value of the property at the time of the sale and the indebtedness to the seller if the fair market value exceeded the amount of the indebtedness.") (internal quotations, citations, and alterations omitted). Thus, where the borrower has no equity in the property, he is entitled to no damages.

Although Plaintiff alleges in the Complaint that the fair market value of the Home at the time of the foreclosure was $114,000, (Doc. 1 at ¶ 81), Plaintiff offers no evidence to substantiate his valuation and points to nothing in the record to controvert Defendants' calculation of the fair market value of the Property as $93,582.25. Therefore, because Plaintiff's total indebtedness – $100,369.01 – exceeded the fair market value of the Property, Plaintiff had no equity in the Property at the time of foreclosure. As such, Plaintiff has failed to show that he suffered damages.

Plaintiff also claims that he suffered mental distress as result of Defendants' actions. "While it is true that an intentional wrongful foreclosure can be the basis for an action for intentional infliction of emotional distress," *Blue View Corp. v. Bell*, 679 S.E.2d 739, 742 (Ga. Ct. App. 2009) (citation omitted), Plaintiff has failed to establish that Defendants acted intentionally or recklessly or that Defendants' conduct was "extreme, outrageous, atrocious, intolerable or beyond the bounds of decency." *Racette v. Bank of Am., N.A.*, 733 S.E.2d 457, 465 (Ga. Ct. App. 2012). To the contrary, the evidence establishes that Defendants exercised their rights consistent with the Note and the Security Deed. Furthermore, Plaintiff has failed

to establish that he suffered emotional distress "so severe that no reasonable man could be expected to endure it." *Bell*, 679 S.E.2d at 742 (quotations and citation omitted). Instead, Plaintiff makes only general assertions of emotional distress and the record demonstrates that he did not seek any medical treatment. *See Jones v. Warner*, 686 S.E.2d 835, 839 (Ga. Ct. App. 2009) (finding that failure to seek medical or psychiatric treatment indicated that symptoms were insufficiently severe). As such, and as further discussed in Section II(H), *infra*, Plaintiff has failed to establish damages for emotional distress.

Accordingly, because Plaintiff has failed to introduce sufficient evidence to satisfy any of the elements of a claim for wrongful foreclosure, Defendants' Motion for Summary Judgment is **GRANTED** as to Count Two.

### E.    Defective Foreclosure Advertisement (Count Fifteen)

Relying on O.C.G.A. § 44-14-162.2, Plaintiff claims that the foreclosure notice (Doc. 1-9) was defective because it failed to identify Fannie Mae as the secured creditor and misidentified Wells Fargo as the entity having the full authority to negotiate, amend, and modify the terms of the Loan. O.C.G.A. § 44-14-162.2(a) requires notice of a foreclosure to be given to the borrower at least thirty days before the date of the proposed foreclosure. The notice is not "required to name either the secured creditor or the note holder." *Abdullahi v. Bank of Am., NA*, 549 F. App'x 864, 867 (11th Cir. 2013) (citing *You v. JPMorgan Chase Bank, N.A.*, 743 S.E.2d 428, 433-34 (2013)). Instead, it "need only identify 'the individual or entity who shall have full authority to negotiate, amend, and modify all terms of the mortgage with the debtor,' which may be the holder of the security deed, the holder of the note, or an attorney or servicing agent." *Jackson v. Bank of Am., NA*, 578 F. App'x 856, 861 (11th Cir. 2014) (quoting *You*, 743 S.E.2d at 431-34)).

Contrary to Plaintiff's contention, the record makes clear that Wells Fargo was the entity with the full authority to negotiate, amend, and modify the Loan. In fact, had Wells Fargo actually lacked the authority to modify the Loan, then the August Modification would not have been a valid offer to contract. Nevertheless, Plaintiff contends that Fannie Mae, and not Wells Fargo, was the entity with the full authority to negotiate, amend, and modify all terms of the Loan. In support, Plaintiff points to the May 2011 email-exchange between

Wells Fargo and Fannie Mae regarding the release of the Insurance Proceeds. (*See* Doc. 40-30.)

Plaintiff maintains that Fannie Mae's instruction to not release the Insurance Proceeds, unless Plaintiff became current under the Loan or was in good standing under a modification, establishes that Fannie Mae was the entity with the fully authority to modify the Loan. Plaintiff is mistaken. Nothing in the email-exchange indicates that Wells Fargo lacked the authority to modify the Loan. Rather, the email-exchange simply discussed the disposition of the Insurance Proceeds. In fact, the same email-exchange upon which Plaintiff relies indicates that Wells Fargo was the one that was attempting to reach a modification with Plaintiff up until the foreclosure sale. Nowhere in the email-exchange does Fannie Mae condition or restrict Wells Fargo's authority to enter into a modification.

The only evidence that could possibly be construed as supporting Plaintiff's claim that Wells Fargo lacked the authority to modify the Loan is the letter from Wells Fargo on July 1, 2011, stating that the investor had declined to modify the mortgage because the Property had not been maintained. Not only is this statement contravened by the evidence discussed herein, but Fannie Mae's representative unequivocally testified that Wells Fargo had the full authority to negotiate and "approve or not approve a loan modification" as well as withdraw an offer for a loan modification. (Doc. 41-4 at 63:19-65:14, 90:3-4.)

Accordingly, because Plaintiff has failed to introduce sufficient evidence demonstrating that Wells Fargo lacked the authority to modify the Loan, there is no genuine issue of material fact to be resolved. As such, the foreclosure notice complied with O.C.G.A. § 44-14-162.2(a) by listing Wells Fargo as the entity with full authority to negotiate, amend, and modify the Loan. *See, e.g., Hall v. HSBC Mortgage Servs., Inc.*, 581 F. App'x 800, 803 (11th Cir. 2014); *Carr v. U.S. Bank, NA*, 534 F. App'x 878, 881 (11th Cir. 2013). Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** as to Count Fifteen.

### F.   Conversion (Count Twelve)

In the Complaint, Plaintiff alleges that "Wells Fargo committed the intentional tort of conversion by wrongfully foreclosing on the lot on which the Home was located, and thereby, converted to its own use the lot." (Doc. 1 at ¶ 125.) Defendants correctly contend

that Plaintiff's claim fails as a matter of law because the tort of conversion applies only to personal property and not real property. *See Kin Chun Chung v. JPMorgan Chase Bank, N.A.*, 975 F. Supp. 2d 1333, 1347 (N.D. Ga. 2013) ("Conversion does not apply to real property."); *Levenson v. Word*, 668 S.E.2d 763, 765 n.2 (Ga. Ct. App. 2008) ("An action for conversion and trover will not lie to recover real property.").

Recognizing the deficiency in his claim as initially pled, Plaintiff alleged in the Amended Complaint that "Defendants committed the intentional tort of conversion when they kept Plaintiff's insurance proceeds in violation of the terms of the Security Deed, wrongfully foreclosed on the Property, and unlawfully collected fees, including but not limited to, the collection of foreclosure-related expenses, and charging Plaintiff's loan account for force-placed homeowners insurance premiums when Defendants knew that there was no home to insure." (Doc. 30-8 at ¶ 111.) However, nowhere in the Complaint did Plaintiff state or allege that Wells Fargo or Fannie Mae improperly charged Plaintiff for homeowners insurance, interest on the unpaid principle balance of the Loan, and attorney and foreclosure fees. (*See* Doc. 1.) Thus, this claim is not properly before the Court. *See Gilmour*, 382 F.3d 1315. Nevertheless, even if it were, Plaintiff's claim would still fail.

"Conversion consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation." *Decatur Auto Center v. Wachovia Bank, N.A.*, 583 S.E.2d 6, 7 (2003) (citation omitted). As explained above, Defendants did not breach the Security Deed by retaining the Insurance Proceeds in lieu of replacing the Home, nor did they wrongfully foreclose on the Property. Furthermore, the Security Deed and Note expressly granted Defendants the right to charge Plaintiff for homeowners insurance, interest on the unpaid principle balance of the Loan, and attorney and foreclosure fees. (Docs. 1-2 at §§ 5, 9, 12, 14, 22; 40-8 at § 6.) Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** as to Count Twelve.

### G.   Breach of the Implied Covenant of Good Faith
###       and Fair Dealing (Count Eight)

"In Georgia, every contract imposes upon each party a duty of good faith and fair dealing in the performance of their respective duties and obligations." *TechBios, Inc. v. Champagne*, 688 S.E.2d 378, 381 (Ga. Ct. App. 2009) (internal quotation and citations omitted). "The implied covenant modifies and becomes a part of the provisions of the contract, but the covenant cannot be breached apart from the contract provisions it modifies and therefore cannot provide an independent basis for liability." *Secured Realty Inv. v. Bank of N. Georgia*, 725 S.E.2d 336, 339 (Ga. Ct. App. 2012).

Plaintiff contends that Defendants breach the implied covenant by: (1) refusing to disburse the Insurance Proceeds; (2) charging him for homeowners insurance; (3) breaching the August Modification by reinitiating foreclosure proceedings after the destruction of the Home; (4) misrepresenting that the Insurance Proceeds could not be released without a valid modification in effect; and (5) unreasonably and improperly charging fees and interest. Because each of these claims have been addressed and rejected by the Court, Plaintiff's claim for breach of the implied covenant likewise fails. *See Layer v. Clipper Petroleum, Inc.*, 735 S.E.2d 65, 73 (Ga. Ct. App. 2012) ("Since [plaintiff] could not prevail on his claims under the Cash Advance Agreement, he likewise could not prevail on his claim for breach of the implied covenant premised on the Cash Advance Agreement."); *U.S. Bank, N.A. v. Phillips*, 734 S.E.2d 799, 803 (Ga. Ct. App. 2012) (finding that because plaintiff's "breach of contract claim under HAMP was not a viable cause of action . . . [plaintiff] could not maintain a claim for breach of the covenant as an independent basis for liability"); *Secured Realty*, 725 S.E.2d at 339 (dismissing claim for breach of the implied covenant where the plaintiff had failed to establish a breach of the underlying agreement). Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** at to Count Eight.

### H.   Intentional Infliction of Emotional Distress (Count Thirteen)

Under Georgia law, a claim of intentional infliction of emotional distress requires a plaintiff to establish the following: (1) that the defendant's conduct was intentional or reckless; (2) that the conduct was extreme and outrageous; (3) that there was "a causal connection between the wrongful conduct and the emotional distress;" and (4) that the

emotional distress was severe. *United Parcel Serv. v. Moore,* 519 S.E.2d 15, 17 (Ga. Ct. App. 1999). In order to be sufficiently extreme and outrageous, the conduct must "go beyond all reasonable bounds of decency so as to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* Actionable conduct generally does not include "mere insults, indignities, threats, annoyances, petty oppressions, or other vicissitudes of daily living." *Id.* "Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law." *Racette v. Bank of America, N.A.,* 733 S.E.2d 457 (Ga. Ct. App. 2012) (citation omitted).

Plaintiff reasserts the same bases to support his claim for intentional infliction of emotional distress as he sets forth to support his other claims. Plaintiff claims that it shocks the conscience that Defendants would ignore the terms of the Security Deed and refuse to replace the Home, all while charging unwarranted fees and interest.[18] As a result of Defendants' actions, Plaintiff asserts that he grew depressed and extremely despondent during the nearly ten-month period he waited for his Home to be replaced. Plaintiff's intentional infliction of emotional distress claim fails for several reasons.

First, the evidence establishes that Defendants exercised their rights consistent with the Note and the Security Deed. Plaintiff offers no evidence that Defendants believed anything to the contrary. As such, Plaintiff has failed to establish that Defendants possessed the requisite intent to inflict emotional distress, or that they were reckless as to the possibility. *See Smith-Tyler v. Bank of Am., N.A.*, 992 F. Supp. 2d 1277, 1282 (N.D. Ga. 2014) (finding that defendant lacked the requisite intent where it "had reason to believe it was collecting on an active loan").

Second, Defendants' conduct was not extreme or outrageous. Even in instances where a lender has exercised "sharp or sloppy business practices," courts have found that

---

[18] Plaintiff also makes a general allegation regarding the issuance of a IRS Form 1099-A, which claimed an outstanding principal balance of $77,299.83. Although Plaintiff claims that the 1099-A was issued to penalize him, these forms are commonly filed after a bank forecloses on a home. *See Olson v. Merrill Lynch Credit Corp.*, 576 F. App'x 506, 512 (6th Cir. 2014) ("IRS Form 1099-A is a document filed by the lender when it acquires an interest in a property or has reason to know a property has been abandoned.") (citation omitted). Furthermore, Plaintiff has failed to explain how he was harmed by the issuance of the 1099.

such conduct does not rise to level of extreme or outrageous. *Id.* (internal quotations and citation omitted); *see also Goodwyn v. Capital One, N.A.*, No. 14-CV-219, 2015 WL 5120860, at *8 (M.D. Ga. Aug. 28, 2015) (finding that although "Defendants may have been wrong and careless in their handling of [Plaintiff's] account, the allegations do not rise to the level of supporting intentional infliction of emotional distress claims and summary judgment is therefore appropriate"). "In fact, far more egregious conduct has failed to satisfy the 'extreme and outrageous' requirement." *Smith-Tyler*, 992 F. Supp. 2d at 1282 (citing *Cook v. Covington Credit of Georgia, Inc.*, 660 S.E.2d 855 (2008) ("[T]hreatening language in the context of collecting a debt does not go beyond all bounds of decency and cannot be regarded as utterly intolerable in a civilized community.")). Certainly, then, Defendants' exercise of their contractual rights to retain the Insurance Proceeds and foreclose on Home does not rise to level of extreme or outrageous.

Lastly, Plaintiff has failed to establish that he suffered severe emotional distress. Plaintiff makes only general assertions of emotional distress, claiming that he became depressed and despondent. Such symptoms, however, are not "so severe that no reasonable man could be expected to endure it." *Bell*, 679 S.E.2d at 742; *see also Witter v. Delta Airlines, Inc.*, 966 F. Supp. 1193, 1201 (N.D. Ga. 1997) (finding that plaintiff's alleged symptoms of "anxiety, sleeplessness, overeating, diarrhea and headaches . . . . are clearly not the type that no reasonable man could expect to endure"). Indeed, Plaintiff did not even seek medical treatment for any of his alleged symptoms. *See Jones*, 686 S.E.2d at 839. As such, Plaintiff has failed to establish that he suffered severe emotional injury.

In sum, Plaintiff has failed to adduce sufficient evidence to support his claim for intentional infliction of emotional distress. Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** as to Count Thirteen.

## I.   Punitive Damages (Count Sixteen)

In Georgia, a court may award punitive damages in a tort action where "it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). Because

Plaintiff has failed to establish any tort claim against Defendants, his claim for punitive damages fails as a matter of law.

However, even if Plaintiff's tort claims did survive, Plaintiff has failed to adduce clear and convincing evidence that Defendants acted with the requisite intent. To the contrary, Defendants simply exercised their contractually derived rights as a result of Plaintiff's default on the Loan. Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** as to Count Sixteen.

### J.    Litigation Expenses (Count Seventeen)

Although litigation expenses are generally not allowed as part of an award of damages, such expenses may be awarded "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." O.C.G.A § 13-6-11. Plaintiff contends that he is entitled to litigation expenses because Defendants allegedly failed to engage in meaningful discovery and caused him unnecessary trouble and expense by selling the Property to a third party instead or rectifying their wrongful foreclosure. Plaintiff's contentions are unavailing.

First, "[t]he elements which will authorize an award under OCGA § 13-6-11 have consistently been found to relate to the conduct arising from the transaction underlying the cause of action being litigated, *not conduct during the course of the litigation itself.*" *David G. Brown, P.E., Inc. v. Kent*, 561 S.E.2d 89, 90 (2002) (emphasis added). Therefore, Plaintiff's contention that Defendants failed to engage in meaningful discovery fails as a matter of law. Second, "statutory recovery for stubborn litigiousness or causing unnecessary trouble and expense is authorized if there exists no bona fide controversy or dispute regarding liability for the underlying cause of action." *Id.* at 90-91. Because Defendants had a bona fide dispute regarding the disposition of the Insurance Proceeds and foreclosure of the Property, Plaintiff's stubborn litigiousness claim likewise fails as a matter of law. *See Horton v. Dennis*, 750 S.E.2d 493, 497 (Ga. Ct. App. 2013) ("A mere refusal to pay a disputed claim is not the equivalent of stubborn litigiousness."). Lastly, in order to establish bad faith, Plaintiff must show that Defendants acted with "dishonest purpose or some moral obliquity," which "implies conscious doing of wrong and a breach of known duty through some motive of

interest of ill will." *Lewis v. D. Hays Trucking, Inc.*, 701 F. Supp. 2d 1300, 1313 (N.D. Ga. 2010) (internal quotations and citations omitted). Nothing in the record indicates that Defendants acted with such a purpose in retaining the Insurance Proceeds and foreclosing on the Property. Accordingly, Defendants' Motion for Summary is **GRANTED** as to Count Seventeen.

## CONCLUSION

In light of the forgoing, Fannie Mae's Motion for Judgment on the Pleadings (Doc. 39) is **GRANTED** and Defendants' Motion for Summary Judgment (Doc. 40) is **GRANTED**. It is hereby **ORDERED** and **ADJUDGED** that Plaintiff shall take nothing by his Complaint (Doc. 1), and **JUDGMENT** shall be entered in favor of Defendants. Accordingly, Plaintiff's Motion to Strike (Doc. 34) is **DENIED** as moot.

**SO ORDERED**, this 29th day of September, 2015.


_____*/s/* Leslie J. Abrams_____
**LESLIE J. ABRAMS, JUDGE**
**UNITED STATES DISTRICT COURT**